IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CASSANDRA WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | 22 CV 1084 |
| THE CITY OF CHICAGO, Illinois, a ) | |
| municipal corporation, and Chicago Police ) | Judge |
| Commander, JASON E. BROWN, ) | |
| ) | Magistrate Judge |
| Defendants. ) | |

## COMPLAINT

Plaintiff CASSANDRA WILLIAMS, through her attorneys, the Law Office of Thomas P. Needham and The HAMILTON LAW OFFICE, LLC, hereby makes this complaint against Defendants the CITY OF CHICAGO and Chicago Police Commander, JASON E. BROWN. In support of this complaint, Plaintiff states the following:

## INTRODUCTION

Cassandra WILLIAMS is a 55-year-old lifelong resident of the CITY of Chicago and 30-year veteran of the Chicago Police Department (CPD). She is currently a sergeant assigned to the Department's narcotics unit. When Chicago was dealing with massive civil unrest that followed the murder of George Floyd by a police officer in Minneapolis on May 25, 2020, the CPD deployed nearly all of its police officers to work extended shifts and deployed them to places outside their normal assignments. Sgt. WILLIAMS was one of those officers.

During this critical time, Defendant BROWN decided that his own home and block deserved special police protection that no other Chicago home or block received. He ordered the team of narcotics officers that WILLIAMS supervised to take up a post on his block in Bridgeport Commons. BROWN ordered this special police protection for his home and family for six nights. When WILLIAMS later began talking about this abuse of BROWN's authority, first to her colleagues at work and later to City of Chicago investigators and media reporters, BROWN

1

retaliated against her with a pattern of conduct designed to make her work life miserable. BROWN did this because there is an entrenched code of silence in the CPD which makes officers afraid to report the misconduct of other officers, especially if they are higher ranking. This case illustrates how the police code of silence functions in the CITY of Chicago.

## JURISDICTION AND VENUE

1. This case is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the First Amendment to the United States Constitution and by the Illinois Whistleblower Act, 740 ILCS 174/5 *et seq*.

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§1331, 1343, and 1367.

3. Venue is proper under 28 U.S.C. §1391(b). All parties reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

## THE PARTIES

4. Plaintiff, Cassandra WILLIAMS, is an employee of the Defendant CITY, and is currently a sergeant working in narcotics unit of the CPD.

5. Defendant JASON E. BROWN is or was an employee of the Defendant CITY holding the rank of lieutenant or commander of the CPD and supervisor in the narcotics unit. At all relevant times, Defendant BROWN was acting within the scope of this employment with Defendant CITY.

6. Defendant CITY OF CHICAGO is a municipal corporation duly incorporated under the laws of the State of Illinois and was at all relevant times the employer and principal of Defendant BROWN. Should Plaintiff prevail in this case, Defendant CITY is liable to Plaintiff and must indemnify Defendant BROWN on Plaintiff's federal claim pursuant to Illinois state law, 735 ILCS 10/9-102.

## FACTS

### Cassandra WILLIAMS' CPD Career

7. Cassandra WILLIAMS became a Chicago police officer in February 1991.

8. During her more than 30-year career, WILLIAMS has held a wide variety of special assignments within the CPD, developing skills in patrol, investigations, administration, community engagement, and crime reduction.

9. WILLIAMS holds a bachelor's degree from Chicago State University.

10. In 2004, the CPD promoted WILLIAMS to the rank of sergeant.

11. As a sergeant, WILLIAMS supervised beat officers as well as gang, tactical and saturation teams, and she served as the Chicago Housing Authority (CHA) liaison sergeant.

12. In June 2016, the CPD assigned WILLIAMS to the organized crimes Division in the narcotics unit.

13. As a sergeant in the CPD narcotics unit, WILLIAMS supervised a team of approximately eight (8) police officers investigating illegal narcotic sales in Chicago's neighborhoods.

14. In December of 2019, WILLIAMS successfully completed Northwestern University Center for Public Safety/ School of Police Staff and Command.

15. WILLIAMS has received numerous awards from the CPD, including the Chicago Crime Commissioner Award of Excellence, a special commendation, three Department commendations, two joint operation awards, and 93 honorable mentions.

### Civil Unrest in Chicago and CPD's Response

16. In late May 2020, in the wake of the George Floyd killing in Minneapolis, the CITY of Chicago began to experience a significant amount of civil unrest.

17. The CPD responded to the civil unrest in Chicago by deploying most of its personnel to work extended shifts in areas of Chicago that needed extra protection.

18. As a result of the civil unrest in Chicago in May and June of 2020, most CPD officers had their days off canceled.

19. Typically, CPD members assigned to the narcotics unit work in plainclothes and in unmarked police vehicles.

20. During the civil unrest in Chicago in May and June of 2020 the CPD ordered its officers to be in full uniform and the CPD equipped its officers with riot gear.

21. WILLIAMS and her team were instructed by the CPD to report to a staging area in the parking lot of Guaranteed Rate Field, the baseball stadium where the White Sox play.

22. Hundreds of other officers were sent to the same area, where they then received instructions from supervisors about their assignments each day.

23. In May and June of 2020, Defendant BROWN was assigned to the narcotics unit and held the rank of lieutenant. Thus, Defendant BROWN held a higher rank than WILLIAMS and he decided where her team would work.

24. In May of 2020, WILLIAMS' team was originally assigned to a location in downtown Chicago.

### June 2, 2020: Defendant BROWN Orders a Police Security Detail to Guard his Bridgeport Block

25. After approximately two days of this assignment, on or about June 2, 2020, Defendant BROWN sent WILLIAMS a text message directing that she come to see him prior to her shift beginning.

26. Defendant BROWN also forwarded another text message to Sgt. WILLIAMS' phone that BROWN had received from his next-door neighbor, Maria Jones. The second text BROWN sent was the following:

> "Good morning, Early this morning Jimmy saw a grey car, pretty raggedy with some kind of writing on the side, 2 black men, one taking either video or pictures of either or both our house or Bozena's house. Jimmy asked what they were doing and the guy got in the car and they left going East on 37th. Jimmy told Greg the car had an Ohio license plate, again with some kind of writing on the side. Not sure if other houses were either videoed or a picture taken, however they were on the south end of the block and can't say how long they were out here."

4

27. Maria Jones is married to a retired Chicago police detective named Greg Jones.

28. When Defendant BROWN and Sgt. WILLIAMS spoke in person on June 2, 2020, BROWN told WILLIAMS that one of his neighbors had seen two "black guys" in his neighborhood taking pictures and that they didn't "belong there," or words to that effect.

29. Defendant BROWN also told WILLIAMS that his wife was upset and his children were afraid due to the civil unrest and because of the "black men" that had been on their block.

30. BROWN told WILLIAMS he was "deploying" her team to the area and he instructed her to take her team to his block and "sit over there and watch," his home, or words to that effect.

31. BROWN also told WILLIAMS that a retired CPD detective named Greg Jones lived next door to him.

32. Defendant BROWN and his family reside in the Bridgeport Commons neighborhood of Chicago.

33. BROWN's home is a short distance from Guaranteed Rate Field, where hundreds of police officers were gathering each day during the civil unrest in May and June of 2020.

34. BROWN gave WILLIAMS his address and told her to "let me know when you are on post."

35. As ordered, WILLIAMS and her team went to the block where Defendant BROWN and his family lived.

36. WILLIAMS notified BROWN that they had arrived as she had been ordered to do.

37. After WILLIAMS and her team had been stationed on BROWN's block for some time, BROWN's wife and other neighbors came outside to welcome them.

38. The neighbors, some of whom are also city employees, made statements thanking WILLIAMS and the other officers for being there to protect their block.

39. One person who approached WILLIAMS stated "we were waiting for you" and another exclaimed "we love the CPD!"

40. One of BROWN's neighbors told WILLIAMS he was the one who had seen the two "black guys" in the "raggedy" car and "those guys don't belong over here," or words to that effect.

41. The team that WILLIAMS supervised stayed on BROWN's block for the rest of their shift, which lasted until late at night.

42. At no time while she was stationed on BROWN's block, did WILLIAMS ever see any car matching the description given by Maria Jones in the text message she sent BROWN.

43. In fact, WILLIAMS did not observe any crime, unrest, or disorder on the block where Defendant BROWN lived. The scene was quiet and peaceful. There was literally nothing for the officers to do on BROWN's block other than to stand around or sit inside their vehicles.

### For six nights, BROWN orders his own publicly funded security detail while other parts of Chicago are looted

44. The next day, June 3, 2020, BROWN ordered WILLIAMS and her team to return to their post on his block.

45. Between June 2, 2020 and June 8, 2020, BROWN ordered WILLIAMS and her team to guard his block for six nights.

46. At first, WILLIAMS viewed this assignment as a sign of trust from her supervisor (BROWN). She felt that receiving this assignment – to guard her boss's family – was a reward for her loyalty and a recognition of her competence. While other officers were being were being spit at and having bottles thrown at them during the Floyd protests, she and her team were safe, eating home baked cookies and being showered with appreciation.

47. Some of the officers WILLIAMS supervised began complaining about the assignment, though, saying that it was "BS" to be watching over BROWN's home when there was no need and when the rest of the CITY was experiencing significant problems, including property damage, looting, and attacks on other officers.

48. WILLIAMS asked BROWN to change her team's assignment.

49. Defendant BROWN refused WILLIAMS' request and continued to assign WILLIAMS' team to watch over his home and block until June 9, 2020, when WILLIAMS was informed that "detail" was over.

50. On several of the nights WILLIAMS and her team were assigned to BROWN's block, BROWN himself came to his home to make sure that the officers were there.

51. During the week in June of 2020 that WILLIAMS and her team were assigned to watch over BROWN's home and block, they did not observe any crimes, make any arrests, issue any citations, or write any police reports.

52. Defendant BROWN's decision to order a team of police officers under his command to act as a personal security detail for his home and block was an abuse of his authority and a waste of scarce law enforcement resources at a critical time in Chicago's history.

### CPD's Code of Silence

53. All of the officers that BROWN ordered to work a post at his home between June 2 to June 8, 2020 knew that they were not actually engaged in work to keep Chicago safe and that BROWN's decision to send them there was wrong.

54. Nevertheless, for months, none of these officers, including WILLIAMS herself, ever came forward to make a formal report about what BROWN had done.

55. WILLIAMS and the other officers did not report BROWN's misconduct because the CPD has for many years had an informal but very powerful "code of silence" that works to hinder even experienced CPD members from disclosing the misconduct of fellow officers.

56. The code of silence is an entrenched tradition within the CPD that deters officers and supervisors from reporting the misconduct of other officers.

57. In August 2015, a Chicago police officer testified in the case of *Spalding v. City of Chicago, et al.,* 12 CV 8777, that instructors at the CPD police academy repeatedly tell officers, "[W]e do not break

the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

58. On December 9, 2015, then Chicago mayor, Rahm Emanuel, delivered a speech to the CITY Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department.

59. Specifically, Former Mayor Emanuel stated: "As we move forward, I am looking for a new leader of the Chicago Police Department to address the problems at the very heart of the policing profession. This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues."

60. Former Mayor Emanuel also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place have failed."

61. Former Mayor Emanuel also stated that he intended to create a task force, the "Police Accountability Task Force" (PATF): "we announced a task force last week of respected and knowledgeable leaders in criminal justice and police oversight who will conduct a very public and thorough review of our existing system of training, oversight, discipline, accountability, and transparency."

62. In April 2016, the CITY's own task force agreed that a code of silence exists within the Chicago Police Department.

63. Specifically, the CITY's task force concluded, among other things, that the code of silence is "institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the CITY."

64. The chairperson of the CITY's PATF was Lori Lightfoot, who was then the president of the Chicago Police Board and is now the mayor, having been elected in 2019.

65. The United States Department of Justice ("DOJ") also undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

66. The DOJ report also concluded that a Code of Silence exists within the Chicago Police Department causing officers cover up the misconduct of other officers.

67. The DOJ report quotes a sergeant on the CPD as saying "if someone comes forward as a whistleblower in the Department, they are dead on the street."

68. The DOJ report became the basis of a legal action instituted against Defendant CITY by the Illinois Attorney General's Office, which led to a consent decree intended to reform the Chicago Police Department.

69. In January 2019, Defendant CITY entered into a court-approved consent decree intended to reform the Chicago Police Department.

70. An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the CITY and CPD's compliance with the Consent Decree in biannual reports. (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.) The IMT has so far issued two reports with a clear trend across both: the CITY and CPD have failed to comply with the reform schedule. In the first report, the CITY and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree. The CITY and CPD missed 37 of 50 deadlines. The CITY's record in the

second report was no better. In that report, filed on June 18, 2020, the CITY and CPD missed 52 of 74 deadlines.

71. CPD continues to fail at reforming its unconstitutional practices and the CITY of Chicago continues to be deliberately indifferent to its failures.

72. In recent years, the CITY of Chicago and the CPD has done little to address the problem of the Code of Silence within the CPD. Instead of admitting its existence and working to combat it, the CITY has repeatedly denied it even exists in court filings and it has used taxpayer funds to hire expert witnesses to opine that it does not exist in the CPD.

73. Instead of protecting officers who speak out about police misconduct, the CITY has turned a blind eye towards a pattern of retaliation by CPD against police officer whistleblowers within its ranks.

74. In this case, the retaliation suffered by WILLIAMS was the direct result of CPD's Code of Silence. It was the motivation and the reason for BROWN's retaliatory conduct toward her.

### WILLIAMS Exercises Her Right to Free Speech and the Retaliation Begins

75. Although neither WILLIAMS nor any of the members on her team immediately reported Defendant BROWN's abuse of authority by filing a formal complaint about his misconduct, they did talk about it amongst themselves and this talk spread to other officers in the narcotics unit and elsewhere within the CPD.

76. Over time, WILLIAMS became more and more ashamed and bothered by the fact that she and her team were sitting in Bridgeport guarding BROWN's block because "two black guys" had driven on his block while the black and BROWN neighborhoods were in serious need of more police officers.

77. Other officers asked WILLIAMS if it was true that she had been assigned with her team to protect BROWN's home during the civil unrest.

78. When asked about it, WILLIAMS did not deny what BROWN had ordered her and her team to do.

79. At the end of September 2020, WILLIAMS was scheduled to take paid time off.

80. In preparation for her time off, WILLIAMS went to speak with Defendant BROWN about the status of a narcotics investigation she and her team had been conducting.

81. While WILLIAMS was explaining the status of that investigation to BROWN, he suddenly interrupted her by asking "Have you been telling people that you sat on my house during the Floyd protests?" and "it'll best if you keep your mouth shut," or words to that effect.

82. After her scheduled time off, WILLIAMS' return to work was delayed as a result of illness.

83. During the time that WILLIAMS was away from work, BROWN was promoted from the rank of lieutenant to commander of the narcotics unit.

84. Cassandra WILLIAMS returned to work in early January 2021.

85. When she returned to work, WILLIAMS learned that BROWN had removed her from supervising a team of narcotics officers and assigned her to work the "duty desk" instead.

86. Examples of the tasks that a sergeant on the "duty desk" perform include approving police paperwork, monitoring security cameras, answering the phone, and keeping track of supplies.

87. Within the CPD narcotics unit, working on the duty desk is considered a less desirable and less prestigious assignment than being actively involved in ongoing narcotics investigations.

88. BROWN also ordered that WILLIAMS be switched from the day shift to the night shift.

89. Nothing about WILLIAMS' work performance justified the decision that BROWN made to remove her from her team, switch her work shift from days to nights, and assign her to the duty desk.

90. Within the CPD, when a someone is treated in the manner that BROWN treated WILLIAMS after she returned to work in January 2021, it is widely perceived as a form of punishment and a message to others that the person being punished is not in favor with the CPD bosses.

91. In fact, many other officers in the CPD narcotics unit received the message that BROWN sent and WILLIAMS began to notice that she was being ostracized, ignored, and not included in meetings or emails.

92. After working for approximately a week on the duty desk, BROWN changed WILLIAMS' assignment again and assigned her to be a "relief sergeant." This means that her job would be to fill in for other sergeants who were on vacation or out sick as the temporary supervisor of their teams.

93. Being a relief sergeant is analogous to being a substitute teacher in school.

94. Being a relief sergeant also means that WILLIAMS was not given overall authority of any narcotics investigations, as she had been before the retaliation began.

95. In addition, the officers she supervised changed frequently, according to the schedules of the other sergeants who had regular teams.

96. Because the teams of officers that WILLIAMS supervised changed so often, it was not possible for her to build relationships with those officers or to effectively lead their ongoing investigations.

97. To date, WILLIAMS remains a "relief" sergeant. She has been shuffled around from team to team for more than a year now.

98. At the CPD, seniority is an important factor in assignment decisions.

99. At the time that the retaliation began, WILLIAMS was the sergeant in the narcotics unit with the second most seniority.

100. Several sergeants with less seniority than WILLIAMS were assigned to specific narcotics teams and were not assigned to be "relief sergeants" like WILLIAMS.

### WILLIAMS Speaks Out Publicly About BROWN's Misconduct

101. After several months of putting up with the embarrassment and stress of being singled out by BROWN for retaliation, WILLIAMS decided to contact the CITY of Chicago's Office of Inspector General (OIG) to make a formal complaint about BROWN.

102. The first time WILLIAMS reached out to the OIG, she was afraid to divulge her name because she feared further retaliation from BROWN and others in the CPD. WILLIAMS felt overwhelmed and emotionally distraught and decided against going through with a formal complaint.

103. After a few days of consideration and prayer, WILLIAMS contacted the OIG a second time.

104. On May 21, 2021, WILLIAMS gave a statement under oath to investigators from the OIG about guarding BROWN's home during the Floyd protests and about the retaliation she had experienced from BROWN for not keeping that assignment a secret.

105. WILLIAMS also spoke to reporters from the *Chicago Tribune* about BROWN ordering her team to guard his home, and about the retaliation by BROWN once he decided she was not keeping his secret well enough.

106. The news story about WILLIAMS's experience was published by the *Tribune* on June 14, 2022.

### Retaliation by a Thousand Cuts: The CPD's Code of Silence at Work in this Case

107. BROWN learned that WILLIAMS had made a complaint about him to the OIG.

108. BROWN also learned that WILLIAMS had spoken with the reporters from the *Chicago Tribune* about him and his order that she and her team guard his home during the Floyd protests.

109. After her public statements, the retaliation against WILLIAMS continued and in fact became more frequent.

110. The retaliation against WILLIAMS was orchestrated by Defendant BROWN and tolerated by others.

111. The retaliation against WILLIAMS has been designed to harass and embarrass WILLIAMS because of her speech.

112. The retaliation since her public disclosure of BROWN's misconduct has had a "death by a thousand cuts" quality to it. For example,

    a. From July 22 through August 6, 2021, WILLIAMS was filling in for another sergeant who was on vacation; this team was short of manpower due to other vacations and officers being injured, so WILLIAMS had to work with only four or five officers instead of the normal eight. During this time period, BROWN summoned WILLIAMS to "accountability meetings" where she was criticized for this team having low productivity, despite the decreased size of the team she was supervising. BROWN stated at this meeting that there would be a quota of two arrests per day for the team WILLIAMS was supervising.

    b. In one meeting, WILLIAMS raised her hand to ask a question, and BROWN simply ignored her though he answered the questions of others.

    c. During meetings, Defendant BROWN refused to acknowledge WILLIAMS, refused to speak to her and refused to even look at her.

    d. On August 20, 2021, BROWN's administrative sergeant instructed WILLIAMS that she had to vacate the office space she has been using as a relief sergeant to make space for BROWN's secretary, leaving WILLIAMS with no desk or other office space.

    e. WILLIAMS had nowhere to put her files or belongings and had to move them to the trunk of her car.

f. On October 5, 2021, WILLIAMS attended a staff meeting where a police officer, Khaled Shaar, began passing out file folders to the attendees. WILLIAMS asked Officer Shaar how he was doing since he had been on medical leave. Shaar did not respond audibly to WILLIAMS but instead, turned to BROWN who was seated nearby. Shaar stated to BROWN "she's a piece of shit," referring to WILLIAMS. BROWN replied "yeah, right," thus expressing his approval of Shaar's vulgar insult.

g. On December 11, 2021, WILLIAMS took a day off of work. She had submitted the paperwork for this day off on December 3, 2021. But on December 11th, BROWN's administrative lieutenant, Kevin Keefe, marked WILLIAMS "absent without permission" and issued what is known in the CPD as a "SPAR" (this means "summary punishment" in CPD lingo) to her. WILLIAMS appealed this punishment to Deputy Chief Daniel O'Shea, who is above Defendant BROWN in the chain of command and on December 21, he reversed the decision.

h. On several occasions, WILLIAMS was told by Defendant BROWN's administrative staff that certain paperwork she was responsible for had not been received from her, even though she had submitted it in a timely fashion. BROWN's staff claimed they could not locate the paperwork. This would cause WILLIAMS to have to complete her paperwork a second time.

i. The narcotics unit regularly sends sergeants and their teams to CPD headquarters to brief the Superintendent of Police on their cases. But WILLIAMS is never permitted to do this, because she is a mere "relief sergeant."

**The City's Deliberate Indifference to the CPD's Code of Silence**

113. This case provides an example of how the code of silence actually works within the CPD: officers who speak out about misconduct or are brave enough to come forward to report misconduct are punished, and their work lives are made miserable.

114. The retaliation that WILLIAMS has experienced is tolerated by the CITY of Chicago because when it occurs, nothing is done to stop it or to hold the retaliators accountable.

115. Nine months after she publicly disclosed that BROWN used the CITY's police officers as a private security detail for his Bridgeport block, the OIG claims that it has not concluded its investigation.

116. While the OIG drags its feet in secrecy, WILLIAMS continues to report to work and continues to experience harassment and retaliation.

117. The CPD has also done nothing to correct or change the behavior of Defendant BROWN. As of the date of the filing of this complaint, he continues as the commander of the CPD narcotics unit.

118. As a result of the failure of the CITY of Chicago and the CPD to take any action to hold Defendant BROWN accountable for his misconduct, he has become emboldened and has retaliated against other officers he supervises for reporting his misconduct.

119. An example of this can be found in the case of CPD Sergeant Marc Vanek, who became aware of BROWN's use of scarce police resources to guard his home and block during the June 2020 civil unrest.

120. Sgt. Vanek complained to BROWN about what he was doing and told him it was not fair to the other officers. BROWN told Sgt. Vanek "Mind your own fucking business, this is my unit and I will do what I want with my people."

121. Sgt. Vanek then filed a formal complaint about BROWN with the CPD bureau of internal affairs.

122. BROWN retaliated against Sgt. Vanek by transferring him from the narcotics unit to a midnight shift in the 11th police district on Chicago's west side.

123. The CITY of Chicago knows about the situation involving BROWN's retaliation against Sgt. Vanek because Vanek has filed a whistleblower suit and the CITY and CPD were provided copies of his complaint.

124. The retaliation that Sgt. Cassandra WILLIAMS has experienced at work at the hands of Defendant BROWN and the persons who act at his behest in enforcing the code of silence against her has caused WILLIAMS significant stress, grief, and embarrassment in front of her colleagues, as well as damage to her reputation.

125. The retaliation against Sgt. Cassandra WILLIAMS is continuing as of the date of the filing of this lawsuit.

**COUNT I**
(First Amendment Retaliation Claim)
42 U.S.C. §1983

126. Each of the preceding paragraphs is re-alleged as if fully restated here.

127. As more fully described above, WILLIAMS engaged in activity protected by the First Amendment when she was speaking to her CPD colleagues about Defendant BROWN's assigning her team of officers to watch his home and block during the June 2020 civil unrest in Chicago.

128. As more fully described above, WILLIAMS engaged in activity protected by the First Amendment when she spoke with investigators from the CITY of Chicago's OIG about Defendant BROWN's misconduct.

129. As more fully described above, WILLIAMS engaged in activity protected by the First Amendment when she spoke with journalists from the *Chicago Tribune* about Defendant BROWN's misconduct.

130. WILLIAM's speech involved a matter of great public concern: a Chicago Police Officer misusing City resources and using police officers under his command as his own private security guards when those officers were greatly needed in other parts of the CITY.

131. WILLIAMS' speech about Defendant BROWN's misconduct, as described above, was a motivating factor that in BROWN's retaliatory behavior towards her.

132. When BROWN retaliated against WILLIAMS, as described in detail above, WILLIAMS suffered a deprivation that is likely to deter protected First Amendment activity by both her and others in the future.

133. As a direct and proximate result of Defendants' misconduct, WILLIAMS suffered damages, including financial, emotional, and damages to her reputation, which will be proven at trial.

**WHEREFORE**, WILLIAMS prays for a judgment against Defendants in a fair and just amount sufficient to compensate her for her damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

**COUNT II**
(Illinois Whistleblower Act Claim)
740 ILCS 174/5 *et seq.*

134. Each of the preceding paragraphs is re-alleged as if fully restated here.

135. WILLIAMS believed or had reasonable cause to believe that the misconduct of BROWN when he used Chicago police officers as his own private security team was a violation of the law.

136. WILLIAMS also believed or had reasonable cause to believe that the misconduct of BROWN violated CPD rules and regulations.

137. Defendant CITY, through its agents and employees, as described above, have retaliated against WILLIAMS because she disclosed what she had reasonable cause to believe to be a violation of the law to a government and law enforcement agency. 740 ILCS 174/15(b).

138. As more fully described above, as a result of WILLIAMS's disclosure of BROWN's misconduct, WILLIAMS has been the target of retaliation by BROWN.

139. The acts of retaliation described above are materially adverse to WILLIAMS and would be to any reasonable employee.

140. WILLIAMS's treatment by the CITY of Chicago, as described above, has caused her significant stress, professional embarrassment, and anguish.

141. As a result of this retaliation, Plaintiff has suffered and will continue to suffer emotional damages, lost wages and benefits, harm to her career and reputation, attorneys' fees and costs, and other damages which will be proven at trial.

**WHEREFORE**, Plaintiff prays for judgment against Defendant CITY and granting Plaintiff:

    a. Compensation for any lost wages and benefits and past and future emotional distress;

    b. Litigation costs, expert witness fees, and reasonable attorneys' fees; and

    c. Any and all other relief that is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY**

RESPECTFULLY SUBMITTED,

CASSANDRA WILLIAMS, Plaintiff

By: /s Thomas P. Needham
    Attorney for Plaintiff

Law Office of Thomas P. Needham
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
312.726.3171
tpn@needhamlaw.com
Attorney No. 6188722

By: /s Torreya L. Hamilton
    Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 620
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397