**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CASSANDRA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22-cv-1084 |
| v. | ) | |
| | ) | Judge Marvin E. Aspen |
| CITY OF CHICAGO and JASON E. | ) | |
| BROWN, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Defendants Jason Brown and the City of Chicago ("the City") move to dismiss Plaintiff Cassandra Williams's Complaint against them with prejudice. (*See* Defendants' 12(b)(6) Motion to Dismiss Plaintiff's Complaint (Dkt. No. 16).)[1] For the following reasons, the motion is denied in part and granted in part.

**BACKGROUND**

We take the following facts from the Complaint, "documents that are critical to the [Complaint] and referred to in it, [] information that is subject to proper judicial notice[,]" and any additional facts set forth in Williams's response brief, "so long as those facts are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quotation marks omitted). We have accepted as true all well-pleaded factual allegations and drawn all reasonable inferences in Williams's favor. *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020).

---

[1] For ECF filings, we cite to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

Williams became an officer with the Chicago Police Department ("CPD") in February 1991. (Complaint ("Compl.") (Dkt. No. 1) ¶ 7.) During her 30-plus years as a Chicago police officer, Williams has held a wide variety of special assignments and developed "skills in patrol, investigations, administration, community engagement, and crime reduction." (*Id*. ¶ 8.) She has also received numerous awards from the CPD, including the Chicago Crime Commissioner Award of Excellence, four commendations, and 93 honorable mentions. (*Id*. ¶ 15.)

Williams was promoted to the rank of sergeant in 2004 and was assigned to the organized crimes division of the CPD's narcotics unit in June 2016. (*Id*. ¶¶ 10, 12.) As a sergeant in the narcotics unit, she supervised a team of eight police officers "investing illegal narcotic sales in Chicago's neighborhoods." (*Id*. ¶ 13.)

On May 25, 2020, George Floyd died while in the custody of Minneapolis police.[2] In the wake of Floyd's death, the City "began to experience a significant amount of civil unrest." (*Id*. ¶ 16.) The CPD responded "by deploying most of its personnel to work extended shifts in areas of Chicago that needed extra protection." (*Id*. ¶ 17.) Williams and her team were originally assigned to a location in downtown Chicago. (*Id*. ¶ 24.)

Around the same time, Brown—who was then a lieutenant—was assigned to the narcotics unit and became Williams's supervisor. (*See id*. ¶¶ 5, 23; Plaintiff's Response to Defendants' Motion to Dismiss ("Resp.") (Dkt. No. 23) at 1.) On June 2, Brown instructed Williams to take her team to the block where he lived so it could watch his house. (Compl. ¶¶ 25–30.) Brown did this even though he lived a short distance from Guaranteed Rate Field's parking lot, where hundreds of police officers were gathering daily at the time. (*Id*. ¶¶ 21, 22,

---

[2] *See, e.g.*, The Associated Press, *Today in History: May 25, death of George Floyd* (May 24, 2022), https://apnews.com/article/death-of-george-floyd-today-in-history-middle-east-minneapolis-congress-b8c1f3e6e2543819a2eeaa126ebfc64d (last visited on Aug. 26, 2022).

33.)  Williams and her team went to Brown's block, and they stayed on the block "for the rest of their shift, which lasted until late at night." (*Id.* ¶¶ 35, 41.)  Between June 2 and June 8, Brown ordered Williams and her team to guard his block for six nights.  (*Id.* ¶¶ 44, 45.)  On June 9, Williams was informed that the "detail" was over.  (*Id.* ¶ 49.)

Although Williams initially viewed the assignment as a sign of trust, a reward for loyalty, and a recognition of her competence, she eventually came to see it as an abuse of Brown's authority and a waste of scarce law enforcement resources.  (*Id.* ¶¶ 46, 52.)  While the rest of the City was facing "significant problems, including property damage, looting, and attacks on other officers," her team was watching a block where there was no crime, unrest, or disorder.  (*Id.* ¶¶ 43, 47, 51.)

In the subsequent months, Williams and her team members discussed their assignment to guard Brown's block.  (*Id.* ¶ 75.)  This "talk spread to other officers," who asked Williams if Brown had ordered her and her team to watch his block during the civil unrest.  (*Id.* ¶¶ 75, 77.)  Williams did not deny it.  (*Id.* ¶ 78.)  Brown caught wind of this and told Williams that it would be best for her to keep her mouth shut.  (*Id.* ¶¶ 80, 81.)

Due to a combination of scheduled paid time off and illness, Williams was away from work from the end of September 2020 through early January 2021.  (*Id.* ¶¶ 79, 82, 84.)  Upon returning to work, Williams learned that Brown, who had been promoted to commander of the narcotics unit during her absence, "had removed her from supervising a team of narcotics officers and assigned her to work the 'duty desk.'"  (*Id.* ¶¶ 83, 85.)  Working the duty desk, which involves "approving police paperwork, monitoring security cameras, answering the phone, and keeping track of supplies," is "a less desirable and less prestigious assignment than being actively involved in ongoing narcotics investigations." (*Id.* ¶¶ 86, 87.)  Brown also switched

Williams from the day shift to the night shift. (*Id.* ¶ 88.) Nothing about Williams's work performance justified Brown's decision "to remove her from her team, switch her work shift from days to nights, and assign her to the duty desk." (*Id.* ¶ 89.) In fact, such a decision is widely perceived in the CPD as a form of punishment and an indication that the subject officer had fallen out of favor with the CPD bosses. (*Id.* ¶ 90.) Williams worked the duty desk for about a week before Brown reassigned her again, this time to a role as a "relief sergeant." (*Id.* ¶ 92.) A relief sergeant, which Williams likens to being a substitute teacher, fills in for other sergeants who are on vacation or out sick and temporarily supervises their teams. (*Id.* ¶¶ 92, 93.)

Sometime later, Williams contacted the City's Office of Inspector General ("OIG") to make a formal complaint about Brown. (*Id.* ¶¶ 101–03.) On May 21, 2021, Williams gave a statement to OIG investigators about guarding Brown's home during the George Floyd protests and about the retaliation she had experienced from Brown for not keeping the assignment secret. (*Id.* ¶ 104.) Williams also spoke to reporters from the Chicago Tribune about guarding Brown's home and the subsequent retaliation. (*Id.* ¶ 105.) The Chicago Tribune published a news story about Williams's experience on June 14, 2021. (*Id.* ¶ 106); *see* Annie Sweeney & William Lee, *Chicago police sergeant alleges commander sent officers to the block his home sits on during last year's unrest*, Chi. Tribune (June 14, 2021), *available at* https://www.chicagotribune.com/news/criminal-justice/ct-unrest-detail-commander-house-20210614-pqoa52om55fx5gqioyaja2ujyu-story.html (last visited Aug. 26, 2022). [3]

According to Williams, after Brown found out about the OIG complaint and Williams's discussions with the Chicago Tribune reporters, the retaliation against her became more frequent.

---

[3] The Complaint erroneously alleges that the news story was published on June 14, 2022.

(Compl. ¶¶ 107–09.) Williams's Complaint sets forth the following examples of retaliation since her public disclosure of Brown's conduct:

- In July and August 2021, Brown criticized Williams for her team's low productivity and gave the team a quota of two arrests per day even though the team had only four or five officers instead of the usual eight officers.

- Brown ignored Williams during meetings.

- In August 2021, Brown's administrative sergeant instructed Williams to vacate her office space to make room for Brown's secretary. This left Williams with no desk or office space and forced her to move her files and belongings to the trunk of her car.

- During a staff meeting in October 2021, Brown replied "yeah, right" when another officer stated that Williams was "a piece of shit."

- In December 2021, Williams took a scheduled day off from work. Brown's administrative lieutenant marked Williams as absent without permission and issued her a summary punishment. The punishment was reversed after Williams appealed it to Brown's superior.

- Brown's administrative staff told Williams on several occasions that it had not received paperwork that Williams had, in fact, timely submitted. This caused Williams to complete her paperwork a second time.

(*Id.* ¶ 112(a)–(h).)

More than a year after returning to work in January 2021, Williams remains a relief sergeant. (*Id.* ¶ 97.) As a relief sergeant, Williams does not have overall authority for narcotics investigations (which she did have before she took her leave), and she is not permitted to brief the Superintendent of Police on cases. (*Id.* ¶¶ 94, 112(i).) Moreover, because the officers she

5

supervises change frequently, she cannot build relationships with them or effectively lead their investigations. (*Id*. ¶¶ 95, 96.) Meanwhile, several other sergeants with less seniority than Williams have been assigned to specific narcotics teams without having to serve as relief sergeants. (*Id.* ¶¶ 99, 100.)

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges "the sufficiency of the complaint, not the merits of the case." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022). In considering a Rule 12(b)(6) motion, "[w]e construe the complaint in the light most favorable to [the] plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in [the] plaintiff's favor." *Taha v. Int'l Bhd. of Teamsters*, 947 F.3d 464, 469 (7th Cir. 2020). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "If the well-pleaded allegations plausibly suggest—as opposed to possibly suggest—that the plaintiff[] [is] entitled to relief, the case enters discovery." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019).

## ANALYSIS

Williams's Complaint contains two counts. Count I asserts a First Amendment retaliation claim, brought under 42 U.S.C. § 1983, against both Brown and the City. (Compl. ¶¶ 126–33.) Count II asserts a claim under Illinois's Whistleblower Act ("IWA"), 740 Ill. Comp. Stat. 174/1 *et seq.*, against the City. (*Id.* ¶¶ 134–41.) Defendants move to dismiss both counts.

(Memorandum in Support of Defendants' 12(b)(6) Motion to Dismiss Plaintiff's Complaint ("Mem.") (Dkt. No. 17) at 1–2.)

## I.     First Amendment Retaliation Claim (Count I)

"The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech." *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). "To state a First Amendment retaliation claim, [Williams] must allege that: (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity she engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017).

### A.     Claim Against Brown

We begin by addressing Williams's First Amendment retaliation claim against Brown. With respect to this claim, Defendants do not argue that the Complaint fails to allege facts satisfying the second or third element of a First Amendment retaliation claim. Defendants' arguments concern only the first element—whether Williams has engaged in activity protected by the First Amendment.

Because Williams is a public employee, her speech is protected by the First Amendment only "if (1) [s]he spoke as a private citizen rather than in [her] capacity as a public employee; (2) [s]he spoke on a matter of public concern; and (3) [her] interest in expressing the speech is not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Lett v. City of Chicago*, 946 F.3d 398, 400 (7th Cir. 2020) (quotation marks omitted). Williams alleges that she engaged in constitutionally protected speech in three separate instances: (1) when she spoke with her CPD colleagues about Brown's assignment to watch his block; (2) when she gave a statement to the OIG investigators about this assignment and

Brown's subsequent retaliation; and (3) when she spoke to Chicago Tribune reporters about the assignment and the retaliation. (Compl. ¶¶ 75, 77, 78, 101–05, 127–29.) Defendants argue that we should dismiss Williams's First Amendment retaliation claim against Brown to the extent it is based on her statement to the OIG because Williams gave this statement pursuant to her official duties, not as a private citizen. (Mem. at 6–8.) Defendants further contend that we should dismiss this claim in its entirety because none of Williams's speech was about a matter of public concern. (*Id.* at 8–10.)

Defendants' attempt to dismiss the portion of Williams's claim that relates to her statement to the OIG is a non-starter. Dismissal of a claim pursuant to Rule 12(b)(6) is an all-or-nothing proposition; we cannot rule on parts of a claim like we can at summary judgment. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). So long as any of Williams's alleged statements plausibly warrants constitutional protection, dismissal is inappropriate. *See Bilek*, 8 F.4th at 587, 589 (where the plaintiff alleged three theories of vicarious liability to support his claim, only one theory needed to be viable for the entire claim to move past the pleading stage).

Ultimately, we need to consider only Williams's disclosure to the Chicago Tribune reporters about Brown's order for "her team to guard his home" (Compl. ¶ 105), which Defendants challenge only on the basis that it is not about a matter of public concern. (Mem. at 9–10; Reply in Support of Defendants' 12(b)(6) Motion to Dismiss Plaintiff's Complaint ("Reply") (Dkt. No. 24) at 4–5.) "The Supreme Court has defined public concern to mean legitimate news interest, or a subject of general interest and of value and concern to the public at the time of publication." *Kubiak v. City of Chicago*, 810 F.3d 476, 482 (7th Cir. 2016) (quotation marks omitted). According to the Complaint, Brown ordered several police officers

to watch the block where he lived for six nights even though (1) there were hundreds of other officers already stationed nearby; (2) there was no rioting or other trouble on the block; and (3) other areas of Chicago were experiencing significant unrest and could have benefited from additional officers. (Compl. ¶¶ 25, 30, 33, 35, 41–45, 47, 49, 51, 76.) Brown's order plausibly reflects a police officer's abuse of authority and a waste of law enforcement resources that were needed elsewhere. (*See, e.g.*, *id.* ¶¶ 52, 130.) This falls squarely within the bounds of the public's concern. *See, e.g.*, *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 671–72 (7th Cir. 2009) ("It is by now well-established that speech protesting government waste addresses a matter of public concern and is therefore entitled to constitutional protection."); *Miller v. Jones*, 444 F.3d 929, 936 (7th Cir. 2006) ("Our cases have consistently held that speech alleging government malfeasance addresses matters of public concern in its substance."); *Campbell v. Towse*, 99 F.3d 820, 828 (7th Cir. 1996) ("Issues involving the proper allocation of police patrols and other departmental resources to various communities in a city are questions of serious public import that one would usually expect to benefit from a full airing in the public marketplace of ideas and opinions." (quotation marks omitted)). And the fact that the Chicago Tribune wrote an article about Williams's experience (Compl. ¶ 106), although not dispositive, further suggests that Brown's order involves a matter of public concern. *See Kingman v. Frederickson*, 40 F.4th 597, 602 (7th Cir. 2022) (evidence that "issues had been the subject of local news coverage" suggested "a broader public interest in that information"); *Zorzi v. Cnty. of Putnam*, 30 F.3d 885, 897 n.11 (7th Cir. 1994) ("the fact that numerous newspaper stories covered [the plaintiff's] lawsuit and the subject of the lawsuit" was evidence that the lawsuit "involved a matter of public concern").

Arguing otherwise, Defendants characterize Brown's order as a mere "staffing decision" that affected only a few police officers. (Mem. at 10; Reply at 5.) But this characterization can only be supported, if at all, by viewing the alleged facts in a light most favorable to Defendants. On a Rule 12(b)(6) motion, though, we do not construe the Complaint in this way. *See Taha*, 947 F.3d at 469. Construing the factual allegations and drawing reasonable inferences in Williams's favor, as we must, we find that Williams's disclosure to the Chicago Tribune reporters about Brown's order plausibly relates to a matter of public concern.

This conclusion, coupled with Defendants' failure to challenge the sufficiency of this disclosure on any other grounds, means that Williams's First Amendment retaliation claim against Brown survives Defendants' Rule 12(b)(6) motion. *See Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021) (the party moving for dismissal under Rule 12(b)(6) "must prove [its] entitlement to relief"); *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020) ("It is the defendant's burden to establish the complaint's insufficiency."). "Of course, the parties may pursue discovery on" Williams's other alleged instances of constitutionally protected speech, and the parties may move for summary judgment with respect to any of these instances without moving on the entirety of Williams's First Amendment retaliation claim. *See Bilek*, 8 F.4th at 589. At this stage, however, we only need to determine whether there are alleged facts that allow this claim to move past the pleadings stage. *See id.* at 587, 589. Because we conclude there are, we deny Defendants' motion to dismiss Williams's First Amendment retaliation claim against Brown.

### B.    Claim Against the City

We next consider Williams's First Amendment retaliation claim against the City. Defendants argue that we should dismiss this claim because Williams has not plausibly pled a claim under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018 (1978).

10

(Mem. at 10–13.) The Supreme Court in *Monell* held that a municipal entity can be liable only for constitutional violations that are "properly attributable to the municipality itself." *Monell*, 436 U.S. at 694, 98 S. Ct. at 2037–38; *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 826 (7th Cir. 2022) (quotation marks omitted). To meet this standard, the plaintiff must show that "a municipal policy or custom is the moving force behind a constitutional violation and [that] the municipal defendant can be said to be culpable or at fault for the violation." *Milchtein*, 42 F.4th at 826 (quotation marks omitted). Williams responds that her First Amendment claim against the City is asserted for indemnification purposes only, not as a *Monell* claim. (Resp. at 10.)

In view of Williams's assertion that she is not proceeding against the City under *Monell* at this time, we agree that her First Amendment claim against the City must be dismissed. To the extent Williams wants to name the City as a defendant for indemnification purposes only, she may amend her Complaint to add a separate count for indemnification against the City based on Brown's alleged First Amendment retaliation. *See T.S. v. Twentieth Century Fox Television*, No. 16 C 8303, 2017 WL 1425596, at *13 n.5 (N.D. Ill. Apr. 20, 2017) (noting that "it is not uncommon for litigants in this district to allege" a state law indemnification claim as a separate count); *Chriswell v. Vill. of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *3 (N.D. Ill. Nov. 4, 2013) (noting that "[i]ndemnification claims routinely accompany" § 1983 claims that are based on a municipal employee's actions); *see also Holstein v. Brill*, 987 F.2d 1268, 1270 (7th Cir. 1993) ("Leave to amend should be freely granted early in a case[.]").

## II.    IWA Retaliation Claim (Count II)

In Count II, Williams alleges that the City violated § 15(b) of the IWA. (Compl. ¶¶ 134–41.) Section 15(b) of the IWA prohibits retaliation "against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable

cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/15(b).

Defendants contend that Williams has failed to adequately plead an IWA retaliation claim for three reasons: (1) the City is immune from liability under Illinois's Local Governmental and Governmental Employees Tort Immunity Act (the "Tort Immunity Act"), 745 Ill. Comp. Stat. 10/1-101 *et seq.*; (2) the retaliation Williams allegedly suffered was not materially adverse; and (3) Williams did not make any disclosures covered by § 15(b). (Mem. at 14–19.) We address each argument in turn.

### A.    The Tort Immunity Act

Defendants first argue that we should dismiss Count II because the City is immune from liability under the Tort Immunity Act. (*Id.* at 14–16.) The Tort Immunity Act "shield[s] a municipality from liability for the discretionary acts or omissions of its employees." *Andrews v. Metro. Water Reclamation Dist. of Greater Chi.*, 2019 IL 124283, ¶¶ 25, 26, 160 N.E.3d 895, 904–05. Immunity under the Tort Immunity Act is an affirmative defense that a municipality must properly raise and prove. *Id.* ¶¶ 23, 29, 160 N.E.3d at 904, 906; *Van Meter v. Darien Park Dist.*, 207 Ill. 2d 359, 370, 799 N.E.2d 273, 280 (2003); *see also Gunn*, 968 F.3d at 806 (a party advancing an affirmative defense has "the burden of pleading and proving" the defense).

We need not consider the merits of Defendants' assertion of immunity because we agree with Williams that the assertion is procedurally improper. (*See* Resp. at 10–11.) Affirmative defenses like immunity under the Tort Immunity Act do not justify dismissing a claim under Rule 12(b)(6). *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, --- F.4th ----, 2022 WL 3355075, at *8 (7th Cir. Aug. 15, 2022); *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019). A party seeking to dismiss a claim at the outset of a case based on an affirmative defense should first raise the defense in its answer and then move for judgment on

the pleadings under Rule 12(c). *Luna Vanegas v. Signet Builders, Inc.*, --- F.4th ----, 2022 WL 3572769, at *2 (7th Cir. Aug. 19, 2022); *Burton v. Ghosh*, 961 F.3d 960, 964–65 (7th Cir. 2020); *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 631–32 (7th Cir. 2020). Recognizing the distinction between Rule 12(b)(6) and Rule 12(c) "is necessary to allocate correctly the burdens of pleading and proof, and can thus be critical to the proper application of the Rule 12 standards." *H.A.L. NY Holdings*, 958 F.3d at 631–32.

Defendants do not dispute that they should have raised the immunity defense in an answer and a Rule 12(c) motion. (Reply at 6–9.) Rather, they simply note that one district court decision held that the "defendants were immune from liability for IWA claims under the Tort Immunity Act" on a motion to dismiss. (*Id.* at 7.) That may be true, but it does not persuade us to ignore the Seventh Circuit's clear pronouncement that "the appropriate vehicle for resolving an affirmative defense" typically is a Rule 12(c) motion, not a Rule 12(b)(6) motion. *Gunn*, 968 F.3d at 806; *see also Luna Vanegas*, 2022 WL 3572769, at *2 (noting that although "courts have sometimes taken shortcuts" and addressed affirmative defenses raised in Rule 12(b)(6) motions, "it is safer to insist on compliance with the rules"). Nor do Defendants contend that Williams pled herself out of court by alleging "facts that establish an impenetrable defense" to her claim, which would allow us to consider Defendants' assertion of immunity at the Rule 12(b)(6) stage. *Luna Vanegas*, 2022 WL 3572769, at *2 (quotation marks omitted); *Gunn*, 968 F.3d at 806. Because Defendants do not contend that this rare and narrow exception applies, *see Luna Vanegas*, 2022 WL 3572769, at *2; *Gunn*, 968 F.3d at 806, we decline to disregard the difference between Rules 12(b)(6) and 12(c). *See Benson*, 944 F.3d at 645 ("This is not one of those cases in which the plaintiff has pleaded herself out of court, and so the difference between Rules 12(b)(6) and 12(c) cannot be disregarded.").

13

### B.  Materially Adverse Action

Defendants next argue that Williams has failed to allege a materially adverse employment action.  (Mem. at 16–17.)  As an initial matter, although a plaintiff must allege facts that plausibly show an adverse employment action to state a retaliation claim under the IWA, *see Sweeney v. City of Decatur*, 2017 IL App (4th) 160492, ¶ 15, 79 N.E.3d 184, 188, Defendants do not point us to any authority that requires a *materially* adverse employment action.  (Mem. at 16–17.)  Defendants assert that § 20 of the IWA defines retaliation short of termination "as an act or omission that would be materially adverse to a reasonable employee" (*id.* at 16 (quotation marks and alteration omitted)), but § 20 does not define retaliation in this or any other way.  *See* 740 Ill. Comp. Stat. 174/20.  Nonetheless, one of Illinois's appellate courts—albeit in a non-precedential, unpublished order—has defined retaliation under the IWA as Defendants do, as have other courts in this District.  *See, e.g.*, *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 2015 IL App (5th) 140443-U, ¶ 23; *Beyer v. Vill. of Niles*, No. 21 C 4428, 2022 WL 815547, at *3 (N.D. Ill. Mar. 17, 2022); *Harris v. City of Chicago*, 479 F. Supp. 3d 743, 750 (N.D. Ill. 2020); *Elue v. City of Chicago*, No. 16 CV 09564, 2017 WL 2653082, at *5 (N.D. Ill. June 20, 2017).  Furthermore, Williams does not dispute that she must plead a materially adverse action to state a claim for retaliation under the IWA.  (*See* Resp. at 12–14.)  We therefore assume for purposes of Defendants' motion that Williams must plausibly allege a materially adverse action to proceed with her IWA retaliation claim.

But what constitutes a materially adverse action under the IWA?  Neither side directs us to any state court opinion addressing the issue, nor have we found a precedential state court opinion that does.  To construe a state statute like the IWA, Illinois courts will look to federal case law interpreting analogous federal statutes when appropriate.  *See, e.g.*, *Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 38, 127 N.E.3d 1056, 1066 (explaining that its

assessment of alleged discrimination and retaliation under the Illinois Human Rights Act was "guided not only by Illinois case law but also by federal case law relating to federal anti-discrimination statutes . . . and the anti-retaliation provisions of those statutes"); *Wynn v. Ill. Dep't of Hum. Servs.*, 2017 IL App (1st) 160344, ¶ 45, 81 N.E.3d 28, 36 ("In the absence of Illinois cases construing the Ethics Act, we may look for guidance to federal courts interpreting analogous statutes."). Thus, because we are unaware of any controlling state court precedent on the issue, we find it appropriate to rely upon federal case law interpreting Title VII's anti-retaliation provision, which requires a materially adverse action. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022).

For a Title VII retaliation claim, a materially adverse action is one that would dissuade a reasonable employee from engaging in the protected activity at issue. *Id.* at 911–12. To be materially adverse, "the actions must rise above 'trivial harms,' such as 'petty slights or minor annoyances that often take place at work and that all employees experience,' which do not qualify as materially adverse." *Id.* at 912 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006)). Although determining how a reasonable employee would act is an objective inquiry, context still matters, and "the significance of any given act of retaliation will often depend upon the particular circumstances" surrounding the plaintiff. *Burlington N.*, 548 U.S. at 68–69, 126 S. Ct. at 2415; *see also Lesiv*, 39 F.4th at 912 ("Context is often key in distinguishing between material actions and petty slights.").

Here, the alleged protected activity is Williams's disclosure of Brown's conduct to others. (*See* Compl. ¶¶ 137, 138 (alleging that Williams's disclosure of Brown's misconduct caused Brown's retaliation).) Williams contends that the following actions show that she was subjected to a materially adverse action in retaliation for this protected activity:

- In early 2021, Brown removed Williams from her supervisory role with the narcotics unit, assigned her to work the duty desk, and switched her from the day shift to the night shift. (Compl. ¶¶ 84, 85, 88.)

- After Williams worked the duty desk for a week, Brown then assigned Williams to serve as a relief sergeant. (*Id.* ¶ 92.)

- In July and August 2021, Brown criticized Williams for her team's low productivity and gave the team a quota of two arrests per day even though the team was understaffed. (*Id.* ¶ 112(a).)

- Brown ignored Williams during meetings. (*Id.* ¶ 112(b)–(c).)

- In August 2021, Brown's administrative sergeant instructed Williams to vacate her office space to make room for Brown's secretary, which forced Williams to move her files and belongings to the trunk of her car. (*Id.* ¶ 112(d)–(e).)

- In October 2021, Brown agreed with a fellow officer's statement that Williams was "a piece of shit." (*Id.* ¶ 112(f).)

- In December 2021, Brown's administrative lieutenant erroneously marked Williams absent without permission and issued her a summary punishment. (*Id.* ¶ 112(g).)

- Brown's administrative staff told Williams on several occasions that it had not received paperwork that she had, in fact, timely submitted, which caused Williams to complete her paperwork a second time. (*Id.* ¶ 112(h).)

(Resp. at 12–13.)

We can reasonably infer that two of these alleged actions—Williams's assignment to the duty desk and her subsequent assignment to serve as a relief sergeant—would dissuade a reasonable employee from disclosing Brown's conduct to others. When these actions took place,

Williams had been a police officer for nearly three decades, a sergeant for more than fifteen years, and a supervisor of a narcotics team for more than four years. (Compl. ¶¶ 7, 10, 12, 13.) She had developed a wide variety of skills and received numerous awards. (*Id.* ¶¶ 8, 15.) Being removed from a role in supervising a team of narcotics officers and being assigned to the duty desk—a less prestigious position with what appears to be significantly diminished substantive responsibilities, such as answering the phone and tracking supplies (*see id.* ¶¶ 86, 87)—could dissuade a reasonable employee in Williams's position from speaking out about her supervisor's misconduct. *See Koty v. DuPage Cnty.*, 900 F.3d 515, 520 (7th Cir. 2018) (noting that "[r]eassignments to less prestigious positions" have been considered materially adverse for retaliation purposes); *Lapka v. Chertoff*, 517 F.3d 974, 985–86 (7th Cir. 2008) (examples reflecting a materially adverse action include "a less distinguished title" and "significantly diminished material responsibilities" (quotation marks omitted)). The same is true for Williams's assignment to serve as a relief sergeant. In this role, Williams no longer has overall authority over narcotics investigations, and her allegations plausibly suggest that this is not the type of role that an officer with her seniority is typically assigned. (*See* Compl. ¶¶ 94, 98–100.) Given Williams's seniority, experience, skills, and accomplishments, a jury could plausibly find that these reassignments—especially Williams's reassignment to relief sergeant, which has lasted for more than a year—go beyond those "petty slights or minor annoyances that . . . all employees experience." *Burlington N.*, 548 U.S. at 68, 126 S. Ct. at 2415. Williams has alleged facts that plausibly show one or more materially adverse actions.

Defendants' arguments to the contrary are unpersuasive. Citing *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007), Defendants contend that Williams has not alleged a materially adverse action because she did not allege diminished compensation, fringe benefits, or financial

17

terms and did not allege facts that show "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in the workplace." (Mem. at 16–17.) The portion of *Lewis* cited by Defendants to support this contention, however, discussed what is necessary to prove an adverse employment action in the context of a Title VII discrimination claim. *Lewis*, 496 F.3d at 650, 652–53. So too does *Torres v. City of Chicago*, No. 99 C 6622, 2000 WL 549588, at *1–3 (N.D. Ill. May 1, 2000), which Defendants cite in their reply to further argue that their actions do not constitute an adverse employment action. (Reply at 10.) But we are addressing a *retaliation* claim, and the standard for proving a material adverse action for a Title VII retaliation claim is easier to satisfy than the standard for proving an adverse employment action for a Title VII discrimination claim. *Lesiv*, 39 F.4th at 911–12. Whereas a plaintiff seeking to prove discrimination under Title VII must show that that the action at issue affected the terms and conditions of her employment, a plaintiff seeking to prove retaliation under Title VII does not; this plaintiff needs to only show that the action would dissuade a reasonable employee from engaging in the protected activity at issue. *Id.*; *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Because Defendants' contentions are premised on a standard that Williams need not satisfy, they do not justify dismissal. *See Gunn*, 968 F.3d at 806 ("It is the defendant's burden to establish the complaint's insufficiency.").

### C. Disclosures Protected by § 15(b) of the IWA

Finally, Defendants contend that Williams's alleged disclosures of information are not protected by § 15(b) of the IWA. (Mem. at 17–19.) An employee seeking to state a claim under § 15(b) must plausibly allege that she (1) disclosed "information to a government or law enforcement agency" and (2) had "reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." *See* 740 Ill. Comp. Stat. 174/15(b). Williams contends that she has alleged three instances of whistleblowing activity that are

protected by § 15(b): "her communications with CPD members regarding Defendant Brown ordering them to watch his block, her report to the OIG about Defendant Brown's misuse of City resources, and her disclosures to the news media." (Resp. at 14.)

Defendants first argue that Williams's disclosures of information to her CPD co-workers and the Chicago Tribune reporters do not satisfy § 15(b)'s "government or law enforcement agency" requirement. (Mem. at 17–18.) Williams does not address this argument in her response (Resp. at 14–15), so we accept it for purposes of this motion. *See, e.g., Taylor v. McCament*, 875 F.3d 849, 855 n.3 (7th Cir. 2017) (the plaintiff's failure to respond to an argument by the defendants "waived any argument to the contrary"); *Wilcosky v. Amazon.com, Inc.*, 517 F. Supp. 3d 751, 767 (N.D. Ill. 2021) (the plaintiff's failure to address an argument by the defendant constituted a concession on the point). That means the adequacy of Williams's IWA retaliation claim depends on her report to the OIG.

Defendants do not argue that this disclosure fails to satisfy the "government or law enforcement agency" element. (Mem. at 17–19; Reply at 10–12.) They instead argue that Williams's report to the OIG did not disclose "a violation of Illinois or federal laws, rules, or regulations." (Mem. at 18–19.) According to Defendants, the fact that Williams allegedly believed or had reasonable cause to believe that Brown's conduct "violated CPD rules and regulations" (Compl. ¶ 136) is insufficient because "CPD rules and regulations are not state or federal laws, rules, or regulations." (Mem. at 18.) Moreover, Defendants continue, Williams's allegation that she believed or had reasonable cause to believe Brown's conduct to be a "violation of the law" (Compl. ¶ 135) does not suffice because Williams pleads no facts to support her allegation that she reasonably believed Brown "violated an unspecified 'law' let alone a *criminal* law[,] which the IWA requires." (Mem. at 18 (emphasis in original).)

19

We agree that Williams's allegations do not sufficiently plead that she believed or had reasonable cause to believe that the information she provided to the OIG "disclose[d] a violation of a State or federal law, rule, or regulation." *See* 740 Ill. Comp. Stat. 174/15(b). We do not see—and Williams does not explain—how CPD rules and regulations constitute laws, rules, or regulations promulgated by either the federal or the state government. As for Williams's assertion that she believed or had reason to believe that Brown's conduct constituted "a violation of the law," more is needed to show that her IWA retaliation claim is plausible. *See Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (a plaintiff "must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate" (quotation marks omitted)); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016) ("[B]are and conclusory allegations . . . are insufficient to state a claim."). Specifically, Williams must allege the law, rule, or regulation that she believed was violated because without this information, we cannot determine whether her other allegations plausibly suggest that this belief was reasonable.

That said, Williams asserts in her response that Brown's actions "violated the Illinois official misconduct law, which makes it a felony for a government official to perform an act for his own personal advantage." (Resp. at 15 (citing 720 Ill. Comp. Stat. 5/33-3(a)(3)).) We arguably could consider this assertion in ruling on Defendants' motion, as it elaborates on what law Williams believes was violated without contradicting anything in the Complaint. *See, e.g.*, *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) (a plaintiff is "free to elaborate on his factual allegations" in opposing a Rule 12(b)(6) motion "so long as the new elaborations are consistent with the pleadings" (quotation marks omitted)); *Taha*, 947 F.3d at 471 (considering allegation that was included in the plaintiff's appeal brief but not in his

complaint).[4]  Nonetheless, because we are already giving Williams an opportunity to amend her

Complaint to add an indemnification claim against the City, we believe the better course here is

to have Williams identify the laws, rules, or regulations she allegedly believed to be violated and

any additional supporting facts in an amended complaint.  Accordingly, we dismiss Count II, but

give Williams leave to amend her Complaint to add additional allegations regarding the laws,

rules, or regulations that she believed were violated by Brown.  *See Holstein*, 987 F.2d at 1270

("Leave to amend should be freely granted early in a case[.]").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. No. 16) is granted in part

and denied in part.  Williams's First Amendment retaliation claim against Brown may proceed as

currently alleged, but we dismiss Williams's First Amendment and IWA retaliation claims

against the City.  Williams has until September 19, 2022 to file an amended complaint if she can

do so in accordance with this opinion and Federal Rule of Civil Procedure 11.  The status hearing

set for September 29, 2022, is stricken and reset to October 27, 2022, at 10:30 a.m.  It is so

ordered.

Honorable Marvin E. Aspen
United States District Judge

Dated: August 29, 2022

---

[4] We acknowledge the Seventh Circuit's statement in *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, that "a plaintiff may not amend his complaint in his response brief."  631 F.3d 436, 448 (7th Cir. 2011).  But the plaintiff's brief in *Pirelli* sought to advance a different type of unjust enrichment claim than what was alleged in the complaint. *Id.* at 447–48; *see also Smith v. Dart*, 803 F.3d 304, 311 n.4 (7th Cir. 2015) (a new claim "cannot be raised in a brief in opposition to a motion to dismiss; it must be pleaded in a new or amended complaint").  Williams's response brief does not attempt to assert a new or different claim.